# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DANIEL OKOE, *on behalf of himself and others similarly situated*, | : | |
| | : | **Case No.:** |
| Plaintiff, | : | **CLASS ACTION COMPLAINT** |
| | : | |
| -against- | : | |
| | : | **JURY TRIAL DEMANDED** |
| PARFUMS DE COEUR, LTD., | : | |
| | : | |
| Defendant. | : | |
| | : | |

Plaintiff DANIEL OKOE ("Plaintiff OKOE" or "Plaintiff"), on behalf of himself and all other persons similarly situated, by his undersigned attorneys, pursuant to this Class Action Complaint against PARFUMS DE COEUR, LTD ("PDC" or "Defendant"), alleges the following:

## NATURE OF THE ACTION

1.     This is a consumer protection class action arising from PDC's deceptive practices in the marketing, advertising, and promotion of its Dr. Teal's Epsom Salt products.  As alleged with specificity herein, through an extensive, widespread, comprehensive, and uniform nationwide marketing campaign, Defendant represents that its Epsom salts offer various non-existent health benefits.

2.     Below is an image of the Pure Epsom Salt Soaking Solution, Detoxify & Energize with Ginger & Clay variant purchased by Plaintiff OKOE:



3.      While the variant purchased by Plaintiff is unique in promising to "Detoxify," all the variants promise to relieve pain from muscle soreness after consumers take Epsom salt baths, as described on the label.

4.      None of the variants can deliver on any of these promises, however, which are accordingly false and likely to deceive and mislead reasonable consumers.

5.     Epsom salt cannot detoxify because the only legitimate meaning of "detoxification" refers to a medical treatment undertaken in hospitals under life-threatening circumstances, usually when there are dangerous levels of drugs, alcohol or other poisons in the body. Defendant uses this term in an attempt to give scientific legitimacy to its bogus claims.

6.     Epsom salt also cannot relieve pain from muscle soreness because it is biologically impossible for the magnesium in the salt to penetrate human skin to the degree that would be required to have any meaningful effect on muscle soreness.

7.     Each person who purchased Dr. Teal's Epsom Salt has been exposed to Defendant's misrepresentations, which are placed prominently on the front labels of the packaging as well as on Defendant's website and other online outlets where Dr. Teal's Epsom Salt is sold.

8.     Plaintiff OKOE was among the victims of Defendant's fraud and brings this action on behalf of himself and all others similarly situated who, from the applicable limitations period up to and including the present (the "Class Period"), purchased Dr. Teal's Epsom Salt products. While the labels on Defendant's numerous Epsom Salt variants differ in minor ways, they all include "eases aches and soreness from muscle pains" or an equivalent expression.  The products encompassed by this action include:

    a.   Dr. Teal's Pure Epsom Salt Soaking Solution – Sooth & Sleep with Lavender ("eases aches and soreness from muscle pains")

    b.   Dr. Teal's Pure Epsom Salt Soaking Solution – Relax & Relief with Eucalyptus & Spearmint ("eases aches and soreness from muscle pains")

    c.   Dr. Teal's Pink Himalayan Mineral Soak – Restore & Replenish with Pure Epsom Salt & Essential Oils ("eases aches & soreness from muscle pain")

    d.   Dr. Teal's Pure Epsom Salt Soaking Solution – Coconut Oil to Nourish and Protect Skin ("eases aches and soreness from muscle pain").

    e.   Dr. Teal's Deep Marine Sea Kelp Mineral Soak – Purify & Hydrate with Pure Epsom Salt & Essential Oils ("eases aches and soreness")

3

f.  Dr. Teal's Ultra Moisturizing Mineral Soak – Super Moisturizer Avocado Oil ("soothe tired, achy muscles, joints & feet")

g.  Dr. Teal's Pure Epsom Salt Soaking Solution – Detoxify & Energize with Ginger & Clay ("eases aches and muscle pains")

h.  Dr. Teal's Pure Epsom Salt Soaking Solution – Pre & Post Workout with Magnesium Sulfate & Menthol (soothes muscle aches and joint pains)

i.  Dr. Teal's Pure Epsom Salt Soaking Solution – Wellness Therapy with Rosemary & Mint ("eases aches and soreness from muscle pains")

j.  Dr. Teal's Pure Epsom Salt Soaking Solution – Soften & Nourish with Milk & Honey ("eases aches and muscle pains")

k.  Dr. Teal's Pure Epsom Salt Soaking Solution – Comfort & Calm with Chamomile ("eases aches and muscle pains")

l.  Dr. Teal's Pure Epsom Salt Soaking Solution – Magnesium Sulfate U.S.P. ("soothes aches, pains, sprains and stings" and "helps relieve muscle tension")

m.  Dr. Teal's Pure Epsom Salt Moisturizing Foot Soak – Softening Remedy with Aloe & Coconut Oil ("eases aches & soreness")

n.  Dr. Teal's Pure Epsom Salt Refreshing Foot Soak – Revives Achy Feet with Cooling Peppermint ("eases aches and soreness")

o.  Any other Dr. Teal's Epsom Salt product promising relief of pain, aches, and/or soreness (individually, a "Product"; collectively, the "Products," which includes all sizes of each variant)

*See* **Exhibit A**

9.   Plaintiff OKOE seeks to end Defendant's dissemination of its false and misleading advertising, correct the false and misleading perception it has created in the minds of consumers, and obtain redress for those who have purchased the Products.

10.  Defendant violates statutes enacted in each of the fifty states and the District of Columbia that are designed to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices, as well as false advertising. These statutes are:

1) Alabama Deceptive Trade Practices Act, Ala. Statues Ann. §§ 8-19-1, *et seq.;*

2) Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et seq.;*

3) Arizona Consumer Fraud Act, Arizona Revised Statutes, §§ 44-1521, *et seq.;*

4) Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq.;*

5) California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.,* and California's Unfair Competition Law, Cal. Bus. & Prof Code § 17200, *et seq.;*

6) Colorado Consumer Protection Act, Colo. Rev. Stat. § 6 - 1-101, *et seq.;*

7) Connecticut Unfair Trade Practices Act, Conn. Gen. Stat § 42-110a, *et seq.;*

8) Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et seq.;*

9) District of Columbia Consumer Protection Procedures Act, D.C. Code § 28 3901, *et seq.;*

10) Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.;*

11) Georgia Fair Business Practices Act, § 10-1-390 *et seq.;*

12) Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statues § 480 1*, et seq.,* and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statutes § 481A-1, *et seq.;*

13) Idaho Consumer Protection Act, Idaho Code § 48-601, *et seq.;*

14) Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.;*

15) Indiana Deceptive Consumer Sales Act, Indiana Code Ann. §§ 24-5-0.5-0.1, *et seq.;*

16) Iowa Consumer Fraud Act, Iowa Code §§ 714.16, *et seq.;*

17) Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50 626, *et seq.;*

5

18) Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et seq.,* and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann §§ 365.020, *et seq.;*

19) Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et seq.;*

20) Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et seq,,* and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et seq.,*

21) Maryland Consumer Protection Act, Md. Com. Law Code § 13-101, *et seq.;*

22) Massachusetts Unfair and Deceptive Practices Act, Mass. Gen. Laws ch. 93A;

23) Michigan Consumer Protection Act, § § 445.901, *et seq.;*

24) Minnesota Prevention of Consumer Fraud Act, Minn. Stat §§ 325F.68, *et seq.;* and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.;*

25) Mississippi Consumer Protection Act, Miss. Code Ann. §§ 75-24-1, *et seq.;*

26) Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.;*

27) Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code §30-14-101, *et seq.;*

28) Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59 1601, *et seq.,* and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et seq.;*

29) Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.;*

30) New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq. ;*

31) New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8 *1, et seq.;*

32) New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57 12 *1, et seq.;*

33) New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq.;*

34) North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51 15 01, *et seq.;*

6

35) North Carolina Unfair and Deceptive Trade Practices Act, North Carolina General Statutes §§ 75-1, *et seq.;*

36) Ohio Deceptive Trade Practices Act, Ohio Rev. Code. Ann. §§ 4165.01. *et seq.;*

37) Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et seq.;*

38) Oregon Unfair Trade Practices Act, Rev. Stat § 646.605, *et seq.;*

39) Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Penn. Stat. Ann. § § 201-1, *et seq.;*

40) Rhode Island Unfair Trade Practices And Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.;*

41) South Carolina Unfair Trade Practices Act, S.C. Code Laws § 39-5-10, *et seq.;*

42) South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37 24 *1, et seq.;*

43) Tennessee Trade Practices Act, Tennessee Code Annotated §§ 47-25-101, *et seq.;*

44) Texas Stat. Ann. §§ 17.41, *et seq.,* Texas Deceptive Trade Practices Act, *et seq.;*

45) Utah Unfair Practices Act, Utah Code Ann. §§ 13-5-1, *et seq.;*

46) Vermont Consumer Fraud Act, Vt. Stat. Ann. tit.9, § 2451, *et seq.;*

47) Virginia Consumer Protection Act, Virginia Code Ann. §§59.1-196, *et seq.;*

48) Washington Consumer Fraud Act, Wash. Rev, Code § 19.86.010, *et seq.;*

49) West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et seq.;*

50) Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100. 18, *et seq.;*

51) Wyoming Consumer Protection Act, Wyoming Stat. Ann. §§40-12-101, *et seq.*

## JURISDICTION AND VENUE

11.    This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d). This is a putative class action whereby: (i) the proposed class consists of over 100 class members; (ii) at least some of the proposed class members have a different citizenship from Defendant; and (iii) the amount in controversy exceeds the sum of value of $5,000,000.00, excluding interests and costs.

12.    This Court has personal jurisdiction over Defendant because its Products are advertised, marketed, distributed, and sold throughout Connecticut; Defendant engages in the wrongdoing alleged in this Complaint throughout the United States, including in Connecticut; Defendant is authorized to do business in Connecticut. Defendant has sufficient minimum contacts with Connecticut and/or otherwise has intentionally availed itself of the markets in Connecticut, rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Defendant's activity in Connecticut is substantial and not isolated. Moreover, Defendant's principal place of business is in Connecticut, granting the court general jurisdiction over the claims of Plaintiff OKOE and other Class members.

13.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, the Defendant has caused harm to Class members residing in this District, and the Plaintiff is a resident of this District.

## PARTIES

**Plaintiff**

14.    Plaintiff DANIEL OKOE is a citizen of the State of New York and a resident of New York County. On May 16, 2018, Plaintiff OKOE was exposed to Defendant's misrepresentations online at Amazon.com and then purchased a 3 pound bag of Defendant's Pure Epsom Salt Soaking

Solution, Detoxify & Energize with Ginger & Clay for $4.87.  Plaintiff OKOE purchased this in reliance on the label representation that the Product "[c]leanse[s] away body's impurities" and "[e]ases aches and soreness from muscle pains."

15.    However, Plaintiff OKOE used the Product as directed and did not experience any of its promised benefits.  As a result of his purchase, Plaintiff OKOE was denied the benefit of his bargain.  He was financially injured when his spent money on a product that did not deliver what it promised and indeed delivered nothing at all.  Since using the Product in no way added to the ordinary experience of taking a bath, he was injured in the amount of the full purchase price.

**Defendant**

16.    Defendant PARFUMS DE COEURS is a company organized under the laws of the State of Connecticut with its principal place of business at 6 High Ridge Park, Floor C2, Stamford, Connecticut 06905.  Its agent for service of process is James V. Stammer, located at the same address.

17.    Defendant manufactures, markets, and sells beauty, personal care, and wellness products throughout the United States, including numerous versions of its Dr. Teal's Epsom Salt, which is sold at a wide variety of retail and online outlets throughout America.

## FACTUAL ALLEGATIONS

**Background on Epsom Salt**

18.    "Epsom salt" is a popular term for magnesium sulfate heptahydrate.  It is named for the English town where it was discovered in 1618 bubbling up in the water from an underground spring by Henry Wicker, a local cowherd.

19.    Wicker's thirsty cattle refused to drink from the pool because it tasted bitter.  It was discovered that upon evaporation the water yielded a salt with a significant laxative effect, and so Epsom salt became known as a treatment for constipation.

20.    Wicker also claimed that animals who had waded in the Epsom-salted waters seemed to heal more quickly from wounds.  Out of this there developed numerous folktales attributing numerous healing properties to Epsom salt, at which point Epsom became visited as a spa town for a time, with visitors expecting all kinds of relief from various painful symptoms.

21.    However, these folk stories are just that, and no more.  Whether or not Epsom salt functions as a laxative, it cannot deliver the pain relief promised by Defendant.  Defendant exploits the mythology that grew out of the discovery of Epsom salt four hundred years ago, in the scientifically ignorant early 17th Century, in order to peddle a snake-oil solution to muscle pain that adds nothing to the benefits of an ordinary hot bath.

**The Products Cannot Detoxify Because "Detoxification" as Used to
Market Health and Wellness Products is a Pseudo-Scientific Concept**

22.    Consumers today are increasingly exposed to a wide range of products promising extraordinary health benefits, including promises to detoxify various organs or the human body as a whole.  However, while the concept of detoxification as used by medical professionals is certainly legitimate, "detoxification" as now used to sell health and wellness products is a marketing concept, not a scientific one.

23.    The reason why is explained by *Science-Based Medicine*, a non-profit, physician-run organization dedicated to exposing "unscientific and pseudoscientific health care ideas"[1]:

> "Detox" is a case of a legitimate medical term being turned into a marketing strategy – all designed to treat a nonexistent condition. In the setting of real medicine, detoxification means treatments for dangerous levels of drugs, alcohol, or poisons, like heavy metals. Detoxification treatments are medical procedures that are not casually selected from a menu of alternative health treatments, or pulled off the shelf in the pharmacy. Real detoxification is provided in hospitals when there are life-threatening circumstances. But then there are the "toxins" that alternative health providers claim to eliminate. This form of detoxification is simply the co-

---

[1] https://sciencebasedmedicine.org/editorial-staff/ (last viewed 06.19.17)

opting of a real term to give legitimacy to useless products and services, while confusing consumers into thinking they're science-based.[2]

24.    Citing the opinions of numerous medical professionals, *The Guardian* confirms that the very concept of detoxification as now marketed by purveyors of detox products is pseudo-medicine that hijacks medical terminology for a quick profit:

> "Let's be clear," says Edzard Ernst, emeritus professor of complementary medicine at Exeter University, "there are two types of detox: one is respectable and the other isn't." The respectable one, he says, is the medical treatment of people with life-threatening drug addictions. "The other is the word being hijacked by entrepreneurs, quacks and charlatans to sell a bogus treatment that allegedly detoxifies your body of toxins you're supposed to have accumulated."
>
> If toxins did build up in a way your body couldn't excrete, he says, you'd likely be dead or in need of serious medical intervention. "The healthy body has kidneys, a liver, skin, even lungs that are detoxifying as we speak," he says. "There is no known way – certainly not through detox treatments – to make something that works perfectly well in a healthy body work better."
>
> "It's a scandal," fumes Ernst. "It's criminal exploitation of the gullible man on the street and it sort of keys into something that we all would love to have – a simple remedy that frees us of our sins, so to speak. It's nice to think that it could exist but unfortunately it doesn't."[3]

**The Products Cannot Relieve Pain from Muscle Soreness**
**Because Magnesium Cannot Penetrate the Skin to a Meaningful Degree**

25.    Paul Ingraham is a science writer who served as an editor at *Science-Based Medicine* for six years and has been running the website painscience.com for fourteen (14) years, a website that offers  "science-powered advice about your stubborn aches, pains, and injuries" and has been

---

[2] https://sciencebasedmedicine.org/the-detox-scam-how-to-spot-it-and-how-to-avoid-it/ (last viewed 06.19.17)

[3] https://www.theguardian.com/lifeandstyle/2014/dec/05/detox-myth-health-diet-science-ignorance (last viewed 06.19.17)

cited over 2400 times in scientific papers.[4]

26.    In a comprehensive literature review of the available research, Ingraham concludes:

> The case for the healing powers of Epsom salt is mostly made by people selling the stuff, or recommending it as carelessly as an old wives' tale. If relatively dilute home salt baths were actually medicinal, then far more concentrated sources like The Dead Sea would have clear health effects, which they definitely do not.[5]

27.    This is to be expected given both the general resistance of the human skin to permeation by ions and molecules dissolved in water and the special properties of magnesium ions in particular:

> Furthermore, the stratum corneum is *generally* an effective barrier to diffusion: ions and molecules dissolved in water mostly cannot pass through the stratum corneum, again because there is minimal water in the outer layers of skin for them to diffuse through. This is not to say that *nothing* gets past the skin, just not much, and definitely not water.

> Magnesium ions have some special properties. Like tapioca, they may swell when wet. In fact, this has been the conventional wisdom for some time, and one of the main reasons that many experts have dismissed the possibility of magnesium absorption.[6]

28.    If magnesium cannot penetrate the human skin, then it cannot deliver whatever health benefits it would otherwise offer.

29.    This inability of transdermally applied magnesium to actually enter the human body is confirmed by the research of Wilhelm Jahnen-Dechent and Markus Ketteler, who conclude:

> Thus, the hydrated magnesium cation is hard to dehydrate. Its radius is ~400 times larger than its dehydrated radius. This difference between the hydrated and the dehydrated state is much more prominent than in sodium (~25-fold), calcium (~25-fold) or potassium (4-fold). Consequently, the ionic radius of dehydrated magnesium is small but biologically relevant. This simple fact explains a lot of magnesium's peculiarities, including its often antagonistic behaviour to calcium,

---

[4] https://www.painscience.com/about.php;

[5] https://www.painscience.com/articles/epsom-salts.php

[6] https://www.painscience.com/articles/epsom-salts.php

despite similar chemical reactivity and charge. For instance, it is almost impossible for magnesium to pass through narrow channels in biological membranes that can be readily traversed by calcium because magnesium, unlike calcium, cannot be easily stripped of its hydration shell.[7]

30.   Similar conclusions were reached in a number of experiments surveyed in a literature review by Uwe Gröber and his colleagues in the journal Nutrients.  In one experiment, for example,

> Eight normal subjects were immersed in Bath spa water for two hours and the renal, haematological, and cardiovascular responses were compared with those in the control periods before and after immersion… As a sign that an uptake of magnesium by the healthy human skin while bathing is not possible or if so, only very limited no change occurred in the plasma concentrations of electrolytes, calcium, phosphate, or magnesium after 2 h bathing (35 °C).[8]

31.   Grober et al. also discuss "[e]xtensive studies of the Israel army with a magnesium-containing skin protectant lotion (IB1) [which] showed that magnesium is not absorbed through the skin":

> The topical skin protectant lotion (IB1) containing magnesium was tested in a human study. Preclinical studies in several animal models have proven the protective efficacy of IB1. In a randomized, placebo-controlled phase I clinical study it was examined whether a magnesium-rich lotion, after repeated topical application, leads to changes in serum magnesium concentrations in 34 healthy volunteers. The 34 subjects administered 10 mL of magnesium-rich lotion or placebo lotion three times daily over a period of three days. The study tested the safety of repeated applications, including ruling out the transdermal permeation of magnesium, which may lead to a dangerous blood magnesium level, since the lotion contains magnesium sulphate. Other objectives included the detection of dermatological adverse effects, the assessment of application convenience, and the effect on daily activities. Importantly, no serious adverse effects were recorded and the lotion did not interfere with daily tasks. There were no significant differences in magnesium levels between the placebo and the study groups in any of the

---

[7] Wilhelm Jahnen-Dechent and Markus Ketteler, *Magnesium basics*, Clin Kidney J. 2012 Feb; 5 (Suppl 1): i3–i14 (citations omitted); https://www.ncbi.nlm.nih.gov/pubmed/26069819

[8] Uwe Gröber, Tanja Werner, Jürgen Vormann, and Klaus Kisters, *Myth or Reality—Transdermal Magnesium?*, Nutrients. 2017 Aug; 9(8): 813; https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5579607/

applications. No toxic levels of magnesium were found in either group.[9]

32.     Moreover, Defendant's explanation for how the Products work is physiologically incoherent.  Defendant's website explains:

> Dr .Teal's Epsom Salt Soaks combine pure Epsom Salt (Magnesium Sulfate U.S.P.) with rejuvenating essential oils to naturally reduce inflammation, revitalize tired, achy muscles, and soothe the senses, which provides relief from stress.[10]

33.     However, Ingraham explains why Epsom Salt cannot possibly *both* reduce inflammation and "revitalize tired, achy muscles":

> [T]he primary source of injury pain is inflammation — a complex and painful physiological process intended to … wait for it … *speed healing*. Indeed, the only known mechanism by which you could recover faster from an injury would be to *increase inflammation*. If bathing in Epsom salts did *that*, it would make you hurt *more*, not less. Of course, there could be other ways to speed up healing — in an "anything's possible" kind of way — but it's still pretty far-fetched that a single molecule could pull off both that miracle *and* reduce pain at the same time.

34.     To the extent Epsom Salt baths relieve muscle pain, they are merely doing what all hot baths do, providing temporary relief without actually accelerating the healing process.  To the extent they actually reduce inflammation, they are *impeding*, not furthering, the muscles' natural healing process, which is something the reasonable consumer has not bargained for.

**<u>Defendant's Misrepresentations Would Deceive A Reasonable Consumer</u>**

35.     A reasonable consumer would be deceived by Defendant's misrepresentation that the Products detoxify and/or relieve pain from muscle soreness.

36.     Reasonable consumers (including Plaintiff and the Class) rely on companies such as Defendant to truthfully and accurately advertise and market their products.

---

[9] Uwe Gröber, Tanja Werner, Jürgen Vormann, and Klaus Kisters, *Myth or Reality—Transdermal Magnesium?*, Nutrients. 2017 Aug; 9(8): 813 (citations omitted); https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5579607/
[10] https://www.drteals.com/

37.    Interviewing psychology professor Peter Ayton, *The Guardian* explains the appeal of

claims like Defendant's to ordinary consumers:

> Peter Ayton, a professor of psychology at City University London, agrees. He says
> that we're susceptible to such gimmicks because we live in a world with so much
> information we're happy to defer responsibility to others who might understand
> things better. "To understand even shampoo you need to have PhD in
> biochemistry," he says, "but a lot of people don't have that. If it seems reasonable
> and plausible and invokes a familiar concept, like detoxing, then we're happy to go
> with it."
>
> Many of our consumer decisions, he adds, are made in ignorance and supposition,
> which is rarely challenged or informed. "People assume that the world is carefully
> regulated and that there are benign institutions guarding them from making any
> kind of errors. A lot of marketing drip-feeds that idea, surreptitiously. So if people
> see somebody with apparently the right credentials, they think they're listening to
> a respectable medic and trust their advice."[11]

38.    Reasonable consumers lack the scientific training to understand why the Products

cannot deliver what they promise.

39.    *Science-Based Medicine* explains why our susceptibility to detox claims in particular

may be hard-wired:

> There's a reason we fall for the marketing of detoxification – we seem hardwired
> to believe we need it, perhaps related to our susceptibility to ideas of sympathetic
> magic. Purification rituals date back to the earliest reaches of recorded history. The
> idea that we're somehow poisoning ourselves and we need to atone for our sins
> seems to be a part of human nature, which may explain why it's still part of the
> world's religions.[12]

**Defendant's Misrepresentations Were Material To A Reasonable**
**Consumer And Were Relied Upon By Plaintiff And The Class**

40.    Defendant's misrepresentation that the Products detoxify and/or relieve pain from

muscle soreness is material to a reasonable consumer because this is the only reason anyone would

---

[11] https://www.theguardian.com/lifeandstyle/2014/dec/05/detox-myth-health-diet-science-ignorance
[12] https://sciencebasedmedicine.org/the-detox-scam-how-to-spot-it-and-how-to-avoid-it/

think to add salt to their baths and purchase the Products.

41.   For this reason, Plaintiff and the Class reasonably relied upon Defendant's misrepresentations in purchasing the Products. They did not know, that Defendant's claims were false, and they would not have purchased the Products had they known the truth about them.

42.   Defendant intended that Plaintiff and the Class rely on its misrepresentations, which are placed prominently on the Products' front label and repeated wherever the Products are sold online.

**Defendant Knew that Its Representations are Deceptive and Misleading**

43.   Defendant knew and continues to know that its representations are false and misleading.

44.   As the manufacturer of the Products, Defendant possesses specialized knowledge regarding the content and effects of the Products and could easily access the scientific consensus regarding detoxification and transdermal magnesium absorption. Thus, it also knows that the Products are of no benefit to anyone.

**Plaintiff And The Class Were Injured By Defendant's Deceptive Conduct**

45.   Plaintiff and the Class were injured by Defendant when Defendant failed to deliver to them the benefit of their bargain.

46.   Plaintiff and the Class paid money for the Products because they promised to detoxify and/or alleviate pain from muscle soreness.  Defendant fails to deliver on this promise, causing Plaintiff and the Class to pay money for something that had no value whatsoever.

47.   Since Defendant's false promises are the only reason reasonable consumers would think to pour salt in their baths, Plaintiff and the Class were injured in the form of a price premium consisting in the entire purchase price.  But for Defendant's misrepresentations, they would have been willing to pay nothing for the salt.

16

## CLASS ACTION ALLEGATIONS

48.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff OKOE  seeks to represent the following class:

> All persons or entities who made retail purchases of the Products in the United States for personal use and not resale within the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the Nationwide Class").

In the alternative, Plaintiff OKOE seeks to represent

> All persons or entities who made retail purchases of the Products in New York for personal use and not resale within the applicable limitations period and/or such subclasses as the Court deems appropriate ("the New York Class")

49.    Plaintiff reserves the right to revise the Class definition based upon facts learned in the course of litigating this matter.

50.    Excluded from this Class are Defendant's current and former officers, directors, and employees, and the judicial officer to whom this case is assigned.

51.    ***Numerosity***. While the exact number and identities of purchasers of the Products are unknown to Plaintiff at this time, Plaintiff is informed and believes that the Class contains thousands of purchasers and is so numerous that individual joinder of all Class members is impracticable.

52.    ***Existence and Predominance of Common Questions of Law and Fact***. Questions of law and fact arise from Defendant's conduct as described herein. Such questions are common to all Class members and predominate over any questions affecting only individual Class members and include:

> a.    Whether Defendant's detoxification claims are false, misleading, and likely to deceive a reasonable consumer;

b. Whether Defendant's pain relief claims are false, misleading, and likely to deceive a reasonable consumer;

c. Whether Defendant's marketing and advertising of the Products is fraudulent and unlawful;

d. Whether Plaintiff and members of the Class sustained monetary loss and the proper measure of that loss;

e. Whether equity calls for disgorgement of unjustly obtained or retained funds, restitution to, or other remedies for the benefit of the Class;

f. Whether Plaintiff and other members of the Class are entitled to other appropriate remedies, including equitable and injunctive relief; and

g. Whether Defendant's conduct rises to the level of reprehensibility under applicable law such that the imposition of punitive damages is necessary and appropriate to fulfill the societal interest in punishment and deterrence, and the amount of such damages.

53. *Typicality*. Plaintiff's claims are typical of those of the Class members because, *inter alia*, Plaintiff and the other Class members were all injured by same uniform conduct, as detailed herein.

54. *Adequacy of Representation*. Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained competent counsel experienced in prosecuting nationwide class actions. Plaintiff understands the nature of his claims herein, has no disqualifying conditions, and will vigorously represent the interests of the Class. Neither Plaintiff nor Plaintiff's counsel have any interests that conflict with or are antagonistic to the interests of the Class.

55. *Superiority*. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by

individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant.  It would not be economically feasible for an individual class member to prosecute a separate action on an individual basis, and it is desirable for judicial efficiency to concentrate the litigation of the claims in this forum. Furthermore, the adjudication of this controversy through a class action will avoid the potentially inconsistent and conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

56.    The prerequisites to maintaining a class action for equitable relief pursuant to Rule 23(b)(2) are also met, as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I

**VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT**
**(CONN. GEN. STAT. ANN. §§ 42-110g, et seq.)**
**(Brought on behalf of the Nationwide Class)**

57.    Plaintiff OKOE realleges and incorporates herein by reference all allegations contained above as if fully set forth herein and further alleges as follows:

58.    Plaintiff OKOE brings this claim individually and on behalf of the other members of the Nationwide Class for violations of the Connecticut Unfair Trade Practices Act ("CUTPA").

59.    CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." CONN. GEN. STAT. ANN. § 42-110g(a).

60.    CUTPA further provides a private right of action under CONN. GEN. STAT. ANN. § 42-110g(a).

61.   CUTPA provides relief for "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by § 42-110b." Id. § 42-110g(a).

62.   A Plaintiff is not required to prove specific or actual damages but need only show that such damages are "capable of being discovered, observed, or established." *Lentini v. Fidelity Nat. Title Ins. Co. of New York*, 479 F. Supp. 2d 292, 302 (D. Conn. 2007).

63.   A deception will be found when "(1) [a] representation, omission or other practice likely to mislead consumers; (2) [c]onsumers . . . interpret the message reasonably under the circumstances; and (3) [t]he misleading representation, omission or practice must be material–that is, likely to affect consumer decisions or conduct." *Caldor, Inc. v. Heslin*, 577 A.2d 1009, 1013 (Conn. 1990).

64.   CUTPA also allows the court in its discretion to award punitive damages. See CONN. GEN. STAT. ANN. § 42-110g(a). These damages are more likely to apply "if the evidence reveals a reckless indifference to the rights of others or an intentional and wanton violation of those rights." *Fabri v. United Tech. Int'l, Inc*., 387 F.3d 109, 124 (2d Cir. 2004).

65.   CUTPA permits courts to award, in their discretion, injunctive or equitable relief. CONN. GEN. STAT. ANN. § 42-110g(d) (West 2007).

66.   As a result of its violations of the CUTPA detailed above, Defendant caused actual damage to Plaintiffs and the other members of the Nationwide Class, who were reasonable deceived that the Products would detoxify and relieve pain from muscle soreness.

67.   Plaintiff and the Nationwide Class are therefore entitled to damages and other relief as provided under the CUTPA, including restitution by way of full refunds of the purchase price for the Products and a permanent injunction prohibiting Defendant from marketing and selling the Products with the misrepresentations described herein.

68.     Plaintiffs also seek court costs and attorneys' fees as a result of Defendant's violation of the CUTPA as provided in CONN. GEN. STAT. ANN. § 42-110g(d).

69.     A copy of this Complaint has been mailed to the Attorney General and the Commissioner of Consumer Protection of the State of Connecticut in accordance with CONN. GEN. STAT. ANN. § 42-110g(c).

70.     Because Defendant's deceptive scheme originated in Connecticut, its principal place of business, CUTPA extends to injuries which may have transpired outside Connecticut. *See H & D Wireless Limited P'ship v. Sunspot*, Civil No. H-86-1026 (D. Conn. Feb. 24, 1987) (13 Conn. L. Trib. No. 17, 22) ("CUTPA does not necessarily require that the violation occur within the state, only that it be tied to a form of trade or commerce intimately associated with Connecticut."); *Metro. Enter. Corp. v. United Techs. Int'l, Corp.*, No. 3:03cv1685 (JBA), 2004 U.S. Dist. LEXIS 12274, at *21-22 (D. Conn. June 28, 2004) ("Examination of the statutory language and interpretive case law reveals no reason why a straightforward application of the phrase 'in this State' would exclude the conduct alleged here: a Connecticut seller, in connection with the sale or the offering for sale of its jet engines, hatching and implementing a plan inside the borders of Connecticut the deceptive or unfair effect of which is felt outside those borders.")

## COUNT II

**INJUNCTION FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
(DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)
(Brought on behalf of the New York Class)**

71.     Plaintiff OKOE realleges and incorporates herein by reference all allegations contained above as if fully set forth herein and further alleges as follows:

72.     Plaintiff OKOE brings this claim individually and on behalf of the other members of the New York Class for violations of NY GBL § 349.

73.     Defendant's business acts and practices and/or omissions as alleged herein constitute

deceptive acts or practices under NY GBL § 349, which were enacted to protect the consuming public from those who engage in unconscionable, deceptive or unfair acts or practices in the conduct of any business, trade or commerce.

74.   NY GBL § 349 provides that "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are . . . unlawful."

75.   Under GBL § 349, it is not necessary to prove justifiable reliance. ("To the extent that the Appellate Division order imposed a reliance requirement on General Business Law [§] 349 … claims, it was error. Justifiable reliance by the plaintiff is not an element of the statutory claim." *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (N.Y. App. Div. 2012) (internal citations omitted)).

76.   Any person who has been injured by reason of any violation of the NY GBL § 349 may bring an action in their own name to enjoin such unlawful act or practice, an action to recover their actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the Defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

77.   The practices of Defendant described in this Complaint, were specifically directed to consumers and violate the NY GBL § 349 for, *inter alia*, one or more of the following reasons:

  a.   Defendant engages in deceptive, unfair and unconscionable commercial practices by misrepresenting the qualities of the Products, which misled Plaintiff and the Class about facts that could not reasonably be known by them;

  b.   Defendant caused Plaintiff and the Class to suffer a probability of confusion and a misunderstanding of legal rights, obligations and/or remedies by and through its conduct;

c.  Defendant makes material misrepresentations and false statements of fact to Plaintiff and the Class that result in Plaintiff and the Class reasonably believing the represented or suggested state of affairs to be other than what they actually are.

78.  Under the circumstances, Defendant's conduct in employing these unfair and deceptive trade practices is malicious, willful, wanton and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

79.  Defendant's actions impact the public interest because Plaintiff and members of the Class were injured in exactly the same way as thousands of others purchasing the Products, as a result of Defendant's generalized course of deception.

80.  By committing the acts alleged in this Complaint, Defendant has misled Plaintiff and the Class into purchasing the Products on the basis of an erroneous belief that the Products detoxify and/or relieve pain from muscle soreness.  This is a deceptive business practice that violates NY GBL § 349.

81.  The foregoing deceptive acts, omissions and practices are directed at consumers.

82.  The foregoing deceptive acts, omissions and practices set forth in connection with Defendant's violations of NY GBL § 349 proximately caused Plaintiff and other members of the Classes to suffer actual damages in the form of, *inter alia*, monies spent to purchase the Products. They are entitled to recover such damages, together with equitable and declaratory relief, appropriate damages, including punitive damages, attorneys' fees and costs.

83.  Plaintiff OKOE, on behalf of herself and all others similarly situated, respectfully demands a judgment enjoining Defendant's conduct, awarding costs of this proceeding and attorneys' fees, as provided by NY GBL § 349, and such other relief as this Court deems just and proper.

## COUNT III

**DAMAGES FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
(DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)
(Brought on behalf of the New York Class)**

84.    Plaintiff OKOE realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

85.    Plaintiff OKOE brings this claim individually and on behalf of the other members of the Class for violations of NY GBL § 349.

86.    Defendant's business act and practices and/or omissions alleged herein constitute deceptive acts or practices under NY GBL § 349, which were enacted to protect the consuming public from those who engage in unconscionable, deceptive or unfair acts or practices in the conduct of any business, trade or commerce.

87.    Under the circumstances, Defendant's conduct in employing these unfair and deceptive trade practices are malicious, willful, wanton and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

88.    Defendant's actions impact the public interest because Plaintiff and members of the Class were injured in exactly the same way as thousands of others purchasing the Products as a result of Defendant's generalized course of deception.

89.    The foregoing deceptive acts and practices are directed at consumers.

90.    The foregoing deceptive acts and practices set forth in connection with Defendant's violations of NY GBL § 349 proximately caused Plaintiff and other members of the Class to suffer actual damages in the form of, *inter alia*, monies spent to purchase the Products. Plaintiff and other members of the Class are entitled to recover compensatory damages, statutory damages, punitive damages, attorneys' fees and costs, and any other relief the Court deems appropriate. Damages can be calculated through expert testimony at trial.

24

## COUNT IV

**DAMAGES FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350**
**(FALSE ADVERTISING LAW)**
**(Brought on behalf of the New York Class)**

91.    Plaintiff OKOE realleges and incorporates by reference the allegations contained in all preceding paragraphs and further alleges as follows:

92.    Plaintiff OKOE brings this claim individually, as well as on behalf of members of the class, for violations of NY GBL § 350.

93.    Defendant has been and/or is engaged in the "conduct of … business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

94.    New York Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …" N.Y. Gen. Bus. Law § 350-a(1).

95.    Defendant caused to be made or disseminated throughout New York and the United States, through advertising, marketing and other publications, statements that were untrue or misleading.

96.    Defendant's affirmative misrepresentations as alleged herein are material and substantially uniform in content, presentation, and impact upon consumers at large. Consumers purchasing the Products were, and continue to be, exposed to Defendant's material misrepresentations.

97.    Plaintiff and members of the Class have suffered an injury, including the loss of money or property, as a result of Defendant's false and misleading advertising.

98.   Pursuant to N.Y. Gen. Bus. Law § 350-e, Plaintiff  and members of the Class seek monetary damages (including actual damages and minimum, punitive, or treble and/or statutory damages pursuant to GBL § 350-a (1)), injunctive relief, restitution and disgorgement of all monies obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

## COUNT V

## COMMON LAW FRAUD

**(Brought on behalf of the Nationwide Class under Connecticut law or, alternatively, the New York Class under New York law)**

99.   Plaintiff  realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

100. Defendant  intentionally  makes  materially  false  and  misleading  representations regarding the Products, claiming that they can detoxify and/or relieve pain from muscle soreness.

101. Plaintiff  and  members  of  the  Class  reasonably  relied  on  Defendant's  false  and misleading representation. They did not know that the Products could not detoxify and/or relieve pain from muscle soreness.  Defendants knew and intended that Plaintiff and the Class would rely on its misrepresentation.

102.  Plaintiff and Class members have been injured as a result of Defendant's fraudulent conduct.

103.  Defendants are liable to Plaintiff and members of the Class for damages sustained as a result of Defendant's fraud.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, seeks judgment against Defendant as follows:

a.      An Order that this action be maintained as a class action and appointing Plaintiff as representative of the Nationwide Class, or in the alternative, the New York Class;

b.      An Order appointing the undersigned attorney as class counsel in this action;

c.      Restitution and disgorgement of all amounts obtained by Defendant as a result of its misconduct, together with interest thereon from the date of payment, to Plaintiff and the proposed Class members;

d.      Declaratory relief as permitted by law or equity, including: enjoining Defendant from continuing the unlawful practices as set forth herein, and directing Defendant to identify, with Court supervision, victims of its conduct and pay them all money they are required to pay;

e.      Statutory pre-judgment and post-judgment interest on any amounts;

f.      Attorneys' fees and costs; and

g.      Such other relief as the Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of

herself and the Class, demands a trial by jury on all questions of fact raised by the Complaint.

Dated: April 23, 2019
       Stamford, Connecticut

Respectfully submitted,

By: */s/ C.K. Lee*
    C.K. Lee

**LEE LITIGATION GROUP, PLLC**
C.K. Lee, Esq., to be admitted *pro hac vice*
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1188
Fax: 212-465-1181
Email: cklee@leelitigation.com

By: */s/ Stephen M. Bourtin*
    Stephen M. Bourtin

**THE BOYD LAW GROUP, PLLC**
Stephen M. Bourtin, Esq. (CT 30443)
68 Southfield Avenue, Two Stamford Landing
Suite 100
Stamford, CT 06902
Tel: 203-921-0322
Email: sbourtin@theboydlawgroup.com

*Attorneys for Plaintiff and the Class*